ACCEPTED
07-14-00346-CV
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
2/11/2015 10:26:38 AM
Vivian Long, Clerk

No. 07-14-00346-CV

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
2/11/2015 10:26:38 AM
VIVIAN LONG
CLERK

In the Court Of Appeals

for the Seventh District Of Texas at Amarillo

**JANE T. DURHAM**
*Appellant*

**v.**

**MARGARET L. DURHAM, et. al.**
*Appellees*

*On Appeal from the 237th District Court,
Lubbock County, Texas
Cause No. 2013-509,100*

**APPELLEES' BRIEF**

No. 07-14-00346-CV

In The

## COURT OF APPEALS

SEVENTH DISTRICT OF TEXAS

Amarillo, Texas

**JANE T. DURHAM**
*Appellant*

v.

**MARGARET L. DURHAM, et. al.**
*Appellees*

*On Appeal from Cause 2013-509,100*
*237ᵗʰ District Court of Lubbock County, Texas*

## BRIEF OF APPELLEES

THE FOUTS LAW FIRM
P. O. Box 5187
Lubbock, Texas 79408-5187
(806) 741-0373 - Phone
(806) 741-1491 – Fax
ajfpat@nts-online.net – E-mail
Aubrey J. Fouts
SBN 07315000
    *Of the Firm*
ATTORNEYS FOR APPELLEES
                    2 February 2015

No. 07-14-00346-CV

In The

**COURT OF APPEALS**

SEVENTH DISTRICT OF TEXAS

Amarillo, Texas

———————

**JANE T. DURHAM**
*Appellant*

**v.**

**MARGARET L. DURHAM, et. al.**
*Appellees*

———————

**IDENTITY OF PARTIES AND COUNSEL**

| Parties | Counsel |
|---|---|
| JANE T. DURHAM, <br><br> *Appellant* | MICHAEL SALES <br> ATTORNEY AT LAW <br> P.O. BOX 2891 <br> LUBBOCK, TEXAS 79408 <br><br> *Counsel for Appellant* |
| MARGARET L. DURHAM, NANCY C. STEWART, DAVID DURHAM, AND BARBARA FLOURNEY, <br><br> *Appellees* | AUBREY J. FOUTS <br> THE FOUTS LAW FIRM <br> P. O. Box 5187 <br> Lubbock, Texas 79408-5187 <br><br> *Counsel for Appellees* |

iii

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................iv

INDEX OF AUTHORITIES........................................................................................vi

STATEMENT OF THE CASE......................................................................................1

STATEMENT OF THE FACTS....................................................................................2

    Background Facts.....................................................................................................3

    Evidence Related to Rule 11 Agreement................................................................8

    Evidence Subsequent to Withdrawal Letter.........................................................10

    Evidence Related to Eileen's Undue Influence Over Jane...................................11

RESPONSE TO APPELLANTS' ISSUE ONE –

    WAS THERE LEGALLY SUFFICIENT EVIDENCE FOR THE TRIAL
    COURT TO FIND THAT THE AGREEMENT WAS A VALID RULE 11
    AGREEMENT AND AN ENFORCEABLE JUDGMENT OF THE TRIAL
    COURT? ............................................................................................................... 16

SUMMARY OF ARGUMENT ..................................................................................16

ARGUMENT AND AUTHORITIES .........................................................................16

    Standard of Review...............................................................................................16

    Requirement for Binding Rule 11 Agreement......................................................18

    Principles of Law Applicable to Effect on Enforcement of Rule 11 Agreement

of Withdrawal of Consent by a Party......................................................................18

    Principle of Law Applicable to Undue Influence.................................................19

    Disregard of Purported Withdrawal of Consent by Jane......................................19

    Undue Influence of Eileen Related to Withdrawal of Consent by Jane..............20

    Eileen's Objection to the Rule 11 Agreement......................................................22

Response to Appellant's Claim that the Rule 11 Agreement Omits Essential Terms......................................................................................................23

CONCLUSION AND PRAYER ...............................................................26

CERTIFICATE OF COMPLIANCE........................................................27

CERTIFICATE OF SERVICE ................................................................28

# INDEX OF AUTHORITIES

*Cases:*                                                                                           *Page*

*Ahmed v. Ahmed,*
   261 S.W. 3d 190, 195 (Tex. App. Houston [14th District] 2008, no pet.)...........24

*Black v. Dallas County Child Welfare Unit,*
   835 S.W. 2d 626, 630 n. 10 (Tex. 1992) ........................................................17

*Breen v. De Lord,* 723 S.W. 2d 166, 171 (Tex. App. Austin, 1986, no writ)..........22

*Brown v. Mesa Distributors, Inc.* 414 S.W. 3d 279, 285 (Tex. App. Houston
[1 District] 2013, no pet.).................................................................................22

*Chavez v. McNeely,*
   287 S.W. 3d 840,845 (Tex. App. Houston [1 District] 2009, no pet.) ...............23

*City of Keller v. Wilson,* 168 S.W. 3d 802, 822-823 (Tex. 2005) ..........................17

*Cole v. Scott,* 331 S.W. 3d 829, 831 (Tex. App. Amarillo, 2011, no pet.)..............18

*Cooper v. Cochran,* 288 S.W. 3d 522, 533 (Tex. App. Dallas, 2009, no pet.)........19

*Decker v. Decker,* 192 S.W. 3d 648, 651 (Tex. App. Ft. Worth, 2006, no pet.).....19

*Ditmore Land and Cattle Co. v. Hicks,* 290 S.W. 2d 499, 501 (Tex. 1956)...........22

*Domingo v. Mitchell,* 257 S.W. 3d 34, 40 (Tex. App. Amarillo, 2008, rev. den.) .24

*Ford Motor Co. v. Castillo,*
   200 S.W. 3d 217, 223 (Tex. App. Corpus Christi, 2006, rev'd on other grounds, 279 S.W. 3d 656)...18

*Jones v. Citibank (South Dakota, N.A.),*
   235 S.W. 3d 333, 338 (Tex. App. Ft. Worth 2007, no pet.)..............................22

*Labay v. Vanhouten,* 322 S.W 3d 416 (Tex. App. Amarillo, 2010, rev. den.). ........17

*McCallon v. Baker's Campground,* 416 S.W. 3d 416, 418 (Tex. 2013).................24

*McGalliard v. Kuhlmann*, 722 S.W. 2d 694, 697 (Tex. 1987) ................................17

*Oakrock Explorations co. v. Killam*,
    87 S.W. 3d 685, 690 (Tex. App. San Antonio, 2002, pet. den.) ........................24

*Padilla v. La France*, 907 S.W. 2d 454, 461 (Tex. 1995) .......................................18

*Rice Food Markets, Inc. v. Ramirez*,
    59 S.W. 3d, 726, 735, 736 (Tex. App. Amarillo, 2001, no writ) .......................17

*Salaymeh v. Plaza Centro*, LLC,
    258 S.W. 3d 236, 240 (Tex. App. Houston [1st District] 2008, no pet.) ..... 17 - 20

*Sharif's v. Steen Automotive, LLC*,
    370 S.W. 3d 126, 142 (Tex. App. Dallas, 2012, no pet.) ........................... 23 - 24

*Rule of Civil Procedure*
    *Rule 11, Texas Rules of Civil Procedure*

*Appendix*...................................................................................... *TABS 1 - 4*

No. 07-14-00346-CV

In The

**COURT OF APPEALS**

SEVENTH DISTRICT OF TEXAS

Amarillo, Texas

---

**JANE T. DURHAM**
*Appellant*

**v.**

**MARGARET L. DURHAM, et. al.**
*Appellees*

---

**BRIEF OF APPELLEES**

---

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

NOW COME MARGARET L. DURHAM, NANCY C. STEWART, DAVID DURHAM, AND BARBARA FLOURNEY, Appellees in this proceeding, and submit this Brief of Appellees in response to the Brief of Appellant, and in support would respectfully show the following:

**STATEMENT OF THE CASE**

Appellees disagree with the statement of the case of the Appellant's Brief. The Appellees offer the following statement of the case:

1

This case involves the enforcement of an agreement, made in open Court and entered of record pursuant to Rule 11 of the Texas Rules of Civil Procedure, after an attempted revocation of consent by Appellant, Jane T. Durham, to the agreement.

The trial pleadings were the Plaintiff's First Amended Petition (CR-88) and the Second Amended Counter-Claim of the Appellees (CR-77).

There were three hearings in these proceedings, which included a hearing on temporary orders on November 8, 2013 (CR-14), hearing on additional motions on February 14, 2014 (CR-49), and a final trial before the Court, without a jury, on April 16, 2014, which resulted in a Judgment being entered on June 27, 2014 (CR-241), enforcing the agreement.

Plaintiff, Jane T. Durham, timely filed a Motion for New Trial on July 17, 2014 (CR-246) and a Notice of Appeal on September 19, 2014 (CR-258). There was no request for Findings of Fact and Conclusions of Law filed in this case, and no Findings of Fact and Conclusions of Law were filed by the Court.

## STATEMENT OF FACTS

Appellees disagree with the statement of facts of Appellant, related the facts relevant to the material issues in this case. In this statement of facts, and brief, the parties will be referred to by their first names, with Jane T. Durham, the Appellant, being referred to as "Jane", and the Appellees: Margaret T. Durham, being referred to as "Margaret", Nancy C. Stewart, being referred to "Nancy", Barbara Flourney,

2

being referred to as "Barbara", and David Durham, being referred to as "David". This statement of facts is presented based on the standard for review of the evidence in which legal sufficiency of the evidence is the only issue presented by the Appellant for determination and this Court's decision as to enforcing the Rule 11 Agreement, being determined without Findings of Fact and Conclusions of Law from the trial court.

## Background Facts

Jane was 92 years of age at the time of the events giving rise to this litigation. (4 RR p. 71, l. 5-6; p.90, l. 4). She had eight children, five of whom were involved in this litigation. Those persons are: Eileen, who was a witness, but was not joined as a party by the Appellant, and who is not a party in this appeal. Margaret, Nancy, Barbara and David are Appellees in this proceeding. (3 RR p. 55, l. 16-24).

Jane had lived in Lubbock beginning in 1985. (4 RR p. 91, l. 14-15). Before Lubbock, she had lived in Fort Collins, Colorado for three years. (4 RR p.91, l. 15-19).

In 2001, she moved to Lufkin, Texas. (4 RR p. 90, l. 15 to p. 93, l. 1). While in Lufkin, she lived in a retirement facility known as Pinecrest. (4 RR p. 92 l. 21 to p. 93, l. 3). Jane had become dependent upon others to take care of her physical and caretaking needs as well as her financial matters, prior to her living in Lufkin.

3

(4 RR p. 135, l. 10-19). Barbara, who lived in Lufkin, became the overseer of her caretaking during the time Jane lived there. (4 RR p. 93, l. 3-6).

For approximately 15 - 20 years Jane had given powers of attorney to her children. (4RR p. 92, l. 1-9).

During the time Jane lived in Lufkin, she was estranged from her daughter Eileen. (4 RR p. 169, l. 4-17; 3 RR p. 25, l. 4-12). She had never given a Power of Attorney to Eileen. (4 RR p. 94, l. 11-15; 3 RR p. 59, l. 10-16). Eileen had never been involved in Jane's care before 2012. (4 RR p. 102, l. 7-10; 3 RR p. 22, l. 24 to p. 23, l. 6).

Jane had not written checks on her account since she began giving powers of attorney to her children. All checks were written by the person having the power of attorney at the time. (4 RR p. 101, l. 1-14).

Jane returned to Lubbock on August 12, 2012. (4 RR p. 100, l. 8-10). At that time she began living at an assisted living facility known as Promiseland. (4 RR p. 101, l. 19-22).

On November 17, 2012, she signed a Durable Power of Attorney designating Margaret and Nancy her attorneys-in-fact with broad powers related to the management of her property, including banking transactions. (4 RR p. 55, l. 2-21; 5 RR P. exh. 1; D exh. 2). After that Power of Attorney was executed, Margaret wrote all checks for Jane's expenses and care. (4 RR p. 114, l. 5-12).

4

Pursuant to the Power of Attorney granted to Margaret and Nancy, $100,000.00 of Jane's funds was deposited into a savings account and the remainder of her funds were deposited into a checking account. (4 RR p. 99, l. 12 to l. 7, p. 100).

On January 5, 2013, Jane became ill with pneumonia and was hospitalized. (4 RR p. 105, l. 12-18). During Jane's hospitalization, Eileen began visiting and staying with her in the hospital. During the hospitalization, Margaret or Eileen stayed around the clock with Jane from January to March 2013. (4 RR p. 106, l. 4 to l. 13). During that time Margaret and Eileen began getting along and worked together for Jane's benefit. Margaret's view of Eileen changed and she began to see Eileen as a natural caregiver. Eileen was closely involved in Jane's caretaking from January to March 2013. (4 RR p. 107, l. 1-19).

During Jane's hospitalization in 2013, Margaret and Nancy discussed Eileen becoming Jane's caretaker. Eileen expressed concern about the care Jane was receiving at Promiseland. They discussed Eileen becoming the caretaker and her being paid the same amount as had been paid to Promiseland for Jane's care. (4 RR p. 107, l. 20 to l. 14, p. 108).

Eileen suggested that a fifth wheel trailer be purchased for her and Jane to live in, which would enable her to take care of her (Eileen's) animals, as well as care for Jane. (4 RR p. 108, l. 15 to l. 2, p. 109).

The arrangement for Eileen to become Jane's caretaker was discussed over approximately two months. (4 RR p. 110, l. 7 – 10). Ultimately, the parties agreed to an arrangement, under which Eileen was to be Jane's caretaker and the terms were that Eileen would care for Jane and be paid $3,600.00 per month to provide services which had been provided by Promiseland, with Margaret and Nancy handling Jane's finances. (4RR p. 110, l. 11 to p. 111, l. 23).

The fifth wheel trailer was purchased at a cost of approximately $6,000.00 with Jane's funds and titled in her name, to provide a place for Jane and Eileen to live. (4 RR p. 136, l. 7-20).

Eileen became Jane's caretaker under the arrangement beginning March 1, 2013. (4 RR p. 113, l. 21-24).

The arrangement worked well in the early months. Margaret wrote all the checks on Jane's account, with Eileen's financial involvement being limited to handling expenses which were to be paid from funds she was paid as caretaker. (4 RR p. 113, l. 25 to p. 114, l. 17).

Margaret had regular contact with Jane after Eileen became caretaker until late summer in 2013.

There began to be problems in the relationship in September 2013, when Margaret had a problem contacting Jane. (3 RR p. 113, l. 6 to l. 5, p. 114).

In October, 2013, Margaret discovered that a car for Jane had been purchased for $35,000.00, without any contact with Margaret or Nancy. She was

6

alarmed and contacted Nancy inquiring about what they should do. They agreed there needed to be immediate closure of the accounts to prevent Eileen from further spending resources of Jane. (3 RR p. 110, l. 11-23).

Margaret closed Jane's account and sent a cashier's check to Nancy in New York. (3 RR p. 110, l. 23 to l. 6, p. 111).

Margaret's testimony was that they never intended to keep Jane's money by the action they took. (3 RR p. 111, l. 23-25). They were looking for an avenue to secure the money until arrangements could be made so her funds could be controlled and used for Jane's benefit. (3 RR p. 112, l. 3-9).

On October 23, 2013, Margaret attempted to contact Eileen about the removal of the funds. She went to the fifth wheel trailer where they were living in an attempt to contact her. Eileen and Jane were pulling out and Margaret chased them for about 45 minutes before losing contact. (3 RR p. 114, l. 5-17). She tried, unsuccessfully, multiple times, to contact Jane by e-mail or texts. (3 RR p. 115, l. 6 - 25).

Margaret testified that she and Nancy removed the money because the funds were not under their mother's control, but under Eileen's control, in their view, and they felt she was squandering Jane's money to provide Eileen a nice car to drive. (3 RR p. 117, l. 2-22).

7

Removing the funds from Jane's account, by Margaret and Nancy, resulted in the filing of suit by Jane in this proceeding. (Appendix exh D - Appellant's Brief). The pleading was filed on October 28, 2013.

**Evidence Related to Rule 11 Agreement**

At the time the suit was filed the trial court scheduled a hearing on temporary orders. (CR 7).

The hearing on November 8, 2013, was recorded in Vol. 2 of the reporter's record. Before testimony was heard, there was a discussion about settlement involving the return of the funds which had been removed from Jane's account and creation of a trust to handle her funds, excluding her monthly income but including her agricultural land, as well as visitation arrangements for her children. The visitation terms were not part of the final judgment and are not a part of this appeal. (2 RR p. 4 – 19).

At the hearing the Court was told that the parties had reached an agreement. (2 RR p. 5, l. 4-12). Molly Manning, Jane's attorney, disclosed to the Court the substance of the agreement, including the return of the funds, which had been taken by Margaret and Nancy from Jane's account, and the establishment of a trust, to handle Jane's funds as well as her real property, but excluding retirement and social security funds. (2 RR p.10 - 15). Visitation arrangements for Appellees with Jane were also mentioned. (2 RR p. 10 15). However, the visitation terms were not part of the final judgment. (CR 231).

8

There was a recess in the proceedings. (2 RR p. 17, l. 15, p. 18, l. 11).

Checks were presented by counsel for the Appellees, Margaret and Nancy, related to the return of funds to Jane, to Jane's attorney at the time. (2 RR p. 20, l. 2 - 9).

Jane had expressed a desire to think about the trust arrangement to handle her finances. (2 RR p. 18, l. 15 - 19). After a second recess (2 RR p. 20, l. 10) there was further discussion on the record with Jane regarding the terms of agreement related to the trust and she confirmed her approval and decision to accept the agreement. (2 RR p. 20, l. 11 – l. 6, p. 21).

Margaret, Nancy, David, and Jane approved the agreement. Eileen stated she didn't approve the agreement. She didn't know whether it made any difference, but she thought it was grossly unfair to Jane. (2 RR p. 24, l. 9 to l. 9, p. 25). The excerpts from the record representing the agreement dictated into the record are reflected in Appendix 1 of this brief.

On November 13, 2013, a letter was sent to the court, Honorable Les Hatch, involving two type-written pages which purportedly was signed by Jane and expressed her desire to revoke her consent to the agreement dictated into the record on November 8, 2013. (5 RR D Exh 3; Appendix 3). Eileen testified that Jane dictated that letter to her, but later testified that she didn't remember exactly if Jane dictated the letter word for word. (3 RR p. 54, l. 3-9). When Jane was asked by her

9

counsel, whether she signed the letter to the judge, she said beginning at 3 RR p. 78, l. 10 the following:

"Q:   Did you sign that letter?

A:   I probably signed it.

Q:   Did you try to get it sent to the judge so the judge would understand?

A:   I hope I did, yes."

## Evidence Subsequent to Withdrawal Letter

On November 15, 2013, seven days after the hearing, Eileen took Jane to a title company in Levelland, Hockley County, and Jane signed a "Gift Deed", conveying her real property to Eileen. (5 RR Exh D-7). Eileen testified she had a conversation with Jane before the initial hearing on November 8, 2013, regarding transferring the land to her. (3 RR p. 32, l. 1-4). She testified Jane told her, before the hearing, that she had a solution to fix everything by giving the farms to her (Eileen) so there was nothing left to fight over. (3 RR p. 43, l. 14 - 25).

At the hearing related to additional orders held on February 14, 2014. (Reporter's record Vol. 3), Jane testified she wanted her children to have her property when she died and she felt like that she still owned the land after the deed to Eileen. She said she gave the deed to Eileen, "because she was the only person I could talk to about it and the one who would help me plan things." (3 RR p. 80, l. 21 to p. 81, l. 13).

At the February 14, 2014 hearing, held on motions filed subsequent to the original hearing, including a motion filed by Molly Manning for an order from the court to distribute the funds held in her trust account which had been delivered to her as a result of the November 8, 2013 agreement. (CR 19).

On February 14, 2014, the current counsel for Jane, Michael Sales, entered an appearance as her attorney. (CR 25).

The Court issued a written ruling on February 24, 2014. (CR 39). A temporary order was to be entered which required the funds held in Ms. Manning's trust account be moved to the trust account of Mr. Sales. The court ordered Eileen restrained from any sale or transfer of the property which was the subject of the "gift deed" to Eileen. (CR 49).

On February 14, 2014, the Court did not address the matter of the enforceability of the Rule 11 Agreement. A final hearing in the case was scheduled for April 16, 2014. (CR 49).

On April 2, 2014, the Appellees filed a Second Amended Counter-Claim which sought, among other relief, specific performance of the Rule 11 Agreement entered on November 8, 2013. (CR 79).

**Evidence Related to Eileen's Undue Influence Over Jane**

At the hearing on February 14, 2014, Eileen testified that Jane's individual retirement account had been cashed in after the hearing on November 8, 2013. Her testimony was that Jane cashed the IRA and took cash of approximately $30,000 to

11

live on. Eileen didn't know how much of that money had been spent as of the date of the hearing on February 14, 2014. (3 RR p. 35, l. 6 to p. 36, l. 6). At that time Jane had other money from retirement benefits, including social security, which were not involved in the trust to be created under the Rule 11 Agreement. (2 RR p. 22, l. 3 to p. 24, l. 23). (3 RR p. 38, l. 16 - 25). The evidence supporting Eileen's undue influence alleged in Appellees' Second Amended Counter-claim, concerning the attempted revocation of consent by Jane to the Rule 11 Agreement, includes the following testimony:

In Vol. 3 of the reporter's record, at p. 64 – 69, Jane testified:

"Q:    She (Eileen) is financially dependent on you, isn't she?

A:    Yes, and I needed her to help me and be with me, of course.

Q:    And are you concerned about displeasing her, because you need her at this point, in your view.

A:    Yes, I am."

In Vol. 3 of the reporter's records page 65, line 24 to page 66, line 9, Jane testified as follows:

"Q:    All right. Now, have you utilized or conferred with Eileen about important decisions that you have made since she has been with you?

A:    Oh, yes.

Q:    So you seek her advice, I take it?

A:    I do.

12

Q:   About almost any decision you make?

A:   Yes, I do.

Q:   Is it fair to say that she has a good bit of influence over your decisions.

A:   Yes."

Jane further testified at the hearing on February 14, 2014 to the following regarding the Rule 11 Agreement as reported in Vol. 3 of the reporter's record, beginning at page 68, line 16 and ending at page 69, l. 10:

"Q:   Do you remember the hearing we had here on November 8th of last year, when Molly Manning was your lawyer.

A:   Yes, I do.

Q:   And Molly is the one that has filed this lawsuit that you hired to represent you?

A:   Okay

Q:   And you remember we had that hearing?

A:   Uh-huh.

Q:   And do you remember that there was a several hour or more spent and you talking to Molly, and I think part of it in the presence of David, and a part of it in the --- maybe with Judge Hatch, I am not sure, but you had a lot of discussion and deciding about reaching an agreement?

A:   Uh-huh.

Q:     And do you recall that ultimately you told the judge you were going to agree to the agreement that had been made?

A:     Yes."

Eileen testified at the hearing on February 14, 2014, regarding the agreement reached at the hearing on November 8, 2013 as follows, beginning at l. 12, p. 27 of Vol. 3 and ending at line 24 of the reporter's record:

"Q (By Mr. Fouts):     Now, were you here at a hearing on November 8, 2013, in which there was an agreement reached on the record?

A:     Yes, I was a little vague about the whole agreement thing because you guys were talking about fixing things and tweaking thing and doing another thing and having something signed. I wasn't sure that it was actually a done, done thing myself. And I don't know that much about the court.

Q:     You didn't hear it put into the record by dictating the agreement into the record?

A:     I don't know. I would have to go look at the transcript to be sure about what it said."

At the beginning of the final hearing on April 16, 2014, counsel for Jane announced that Eileen and Jane were in Arizona, and he assumed that they had been there for three or four weeks. That they were unable to come to the hearing due to some problem with Jane's oxygen. A continuance was requested and denied by the Court. (4 RR p. 6, l. 6 to l. 23, p. 8).

14

The factual evidence developed at that hearing, relevant to the decision in this appeal, is described and recited in references to Vol. 4 of the Reporter's record in this statement of facts above.

## RESPONSE TO APPELLANT'S ISSUE ONE

Issue One: Was there legally sufficient evidence for the trial court to find that the agreement was a valid Rule 11 Agreement and an enforceable judgment of the trial court?

## SUMMARY OF ARGUMENT

The only issue presented by the Appellant in her brief involves the legal sufficiency of the evidence to support the Rule 11 Agreement entered into on November 8, 2013 and an enforceable judgment, based on the Rule 11 Agreement, by the trial court. (PG 2 Appellant's Brief).

There were no Findings of Fact and Conclusions of Law requested or filed in this proceeding.

Under the appropriate standard of review in this case Appellees contend that the evidence is legally sufficient to support implied findings of the trial court involving the trial court concluding Jane's purported withdrawal of consent to the Rule 11 Agreement of the parties was ineffective, either because the court could disregard Jane's purported withdrawal of her consent, or the letter relied on as her withdrawal of consent was the result of undue influence of Eileen over Jane and was, therefore, ineffective.

## ARGUMENT AND AUTHORITIES

### Standard of Review

This appeal involves only the legal sufficiency of the evidence to support the Rule 11 Agreement and the Judgment of the Court.

16

In this case the standard of review of the evidence involves the following principles:

In a legal sufficiency standard of review case, the appellate court considers only the evidence and inferences that tend to support the findings of the trial court and the court disregards all contrary evidence and inferences. *Rice Food Markets, Inc. v. Ramirez*, 59 S.W. 3d, 726, 735, 736 (Tex. App. Amarillo, 2001, no writ); *Labay v. Vanhoutin*, 322 S.W 3d 416 (Tex. App. Amarillo, 2010, rev. den.); *City of Keller v. Wilson*, 168 S.W. 3d 802, 822-823 (Tex. 2005).

The fact finder, whether jury or the trial court in a bench trial, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. The fact finder is entitled to believe one witness and disbelieve another and exclusively resolves inconsistency in testimony. *McGalliard v. Kuhlmann*, 722 S.W. 2d 694, 697 (Tex. 1987). The trial court may decline to accept as truth the testimony of an interested witness, even if not contradicted. *Salaymeh v. Plaza Centro*, LLC, 258 S.W. 3d 236, 240 (Tex. App. Houston [1st District] 2008, no pet.).

Where no Findings of Fact and Conclusions of Law are filed, the reviewing court must imply all necessary fact findings to support the final trial court judgment. *Black v. Dallas County Child Welfare Unit*, 835 S.W. 2d 626, 630 n. 10 (Tex. 1992).

17

## Requirement for Binding Rule 11 Agreement

A binding agreement under Rule 11 may be evidenced either by an agreement signed and filed with the papers as a part of the record or it may be made in open court and entered of record. (Rule 11, Texas Rules of Civil Procedure, Appendix 4).

## Principles of Law Applicable to Effect on Enforcement of Rule 11 Agreement of Withdrawal of Consent by a Party

A principle of law which is essential to the decision in this appeal is that, while the trial court cannot render a valid "agreed judgment" based on an agreement absent consent at the time the judgment is rendered, the trial court, after proper notice and hearing, may enforce the settlement agreement as complying with Rule 11 of the Texas Rules of Civil Procedure, even though one side no longer consents to the settlement.

The judgment under these circumstances is not based on the written agreement as an agreed judgment, but, instead, is a judgment enforcing the Rule 11 Agreement. *Padilla v. La France*, 907 S.W. 2d 454, 461 (Tex. 1995); *Cole v. Scott*, 331 S.W. 3d 829, 831 (Tex. App. Amarillo, 2011, no pet.); *Ford Motor Co. v. Castillo*, 200 S.W. 3d 217, 223 (Tex. App. Corpus Christi, 2006, rev'd on other grounds, 279 S.W. 3d 656).

18

## Principle of Law Applicable to Undue Influence

Undue influence occurs when there is such dominion and control exercised over the mind of a party, under the facts and circumstances then existing, as to overcome her free will and cause her to do something she would not otherwise have done. _Cooper v. Cochran_, 288 S.W. 3d 522, 533 (Tex. App. Dallas, 2009, no pet.); _Decker v. Decker_, 192 S.W. 3d 648, 651 (Tex. App. Ft. Worth, 2006, no pet.).

## Disregard of Purported Withdrawal of Consent by Jane

At a hearing on temporary orders on November 8, 2013, there was dictated into the record an agreement of the parties between the Appellees in this case and Jane. The parties approved the agreement on the record. Eileen expressed her objection to the agreement at that time. (Appendix 1).

The second hearing was held on February 14, 2014. The order of the court after that hearing does not address the enforcement of the Rule 11 Agreement. Up to that time no order had been entered by the Court related to the Rule 11 Agreement. (CR 49).

Jane signed a letter dated November 13, 2013 which was sent to the court and purported to withdraw her consent to the Rule 11 Agreement. However, because of the circumstances under which the letter was prepared, as outlined at pages 9 and 10 of the statement of facts in this brief, the court as the sole judge of the credibility of the witnesses and weight to be given to their testimony could

disregard the letter as not effectively withdrawing Jane's consent. Further Eileen was an interested witness, who actually drafted the letter, and the trial court was entitled to disregard her testimony. *Salaymeh v. Plaza Centro*, LLC, 258 S.W. 3d 236, 240 (Tex. App. Houston [1st District] 2008, no pet.)

**Undue Influence of Eileen Related to Withdrawal of Consent by Jane**

Prior to the final hearing, Respondents (Appellees) amended their counter-claim (CR 79). In the Amended Counter-Claim, Counter-Plaintiffs' requested specific enforcement of the agreement dated November 8, 2013. (CR 5-86), and alleged Jane's attempted withdrawal of consent was the result of Eileen's undue influence.

The evidence bearing on the issue of the enforceability of the Rule 11 Agreement includes the following, as outlined in the statement of facts in this brief, and supports an implied finding of the trial court that Eileen's exercise of undue influence over Jane's decision resulted in the withdrawal of her purported withdrawal of consent being ineffective:

1.      Eileen's conduct, following the hearing on November 8, 2013, in transporting Jane to Levelland and Jane executing a "Gift Deed" conveying all of her Hockley County real estate to Eileen, which property was to be included in the trust under the Rule 11 Agreement supports a finding of undue influence

2.      The evidence that Jane was a person who relied on others for her caretaking and handling of financial matters for many years and that she became

20

dependent upon Eileen, supports a conclusion Jane was vulnerable to being unduly influenced by Eileen.

3. The testimony, content and circumstances of the typewritten letter dated November 15, 2013, purportedly signed by Jane, and sent to the trial judge, which referred to the Rule 11 Agreement, and was allegedly, dictated by Jane, in the context of her age, frailty and vulnerability to Eileen's influence, raises a clear inference that Eileen's view was reflected, rather than Jane's, by that letter.

4. The cashing of Jane's IRA after the November 8, 2013 Rule 11 Agreement involving approximately $30,000.00, taken in cash, and utilized by Eileen, without accountability, further supports an inference and conclusion that Eileen was in control of the handling of Jane's financial resources, rather than Jane exercising control.

5. Jane's direct testimony regarding her dependence on Eileen and Eileen's influence over her decisions, standing alone, would support the trial court's conclusion that Jane was acting under Eileen's undue influence during all the time Eileen was her caretaker. (See pgs 11- 12 statement of facts).

The evidence outlined in this brief is ample basis for the trial court to conclude that Jane was acting under undue influence and that she did not effectively withdraw her consent to the Rule 11 Agreement.

21

## Eileen's Objection to the Rule 11 Agreement

Appellant contends that the Rule 11 Agreement was invalid because Eileen did not agree to it. The response to this contention involves an analysis of Eileen's position as reflected by the trial court's final judgment. The only mention in the judgment of any matter related to Eileen is a reference to her being paid reasonable compensation, initially in the amount of $3,600.00 per month as long as Jane and Eileen agree that Eileen was to provide care for her. (CR 231 at p. 4). She was not a party to any agreement otherwise. The record reflects she accepted benefit's under the agreement by continuing to receive money and care for Jane after the agreement and her stated disapproval of it.

Eileen's acceptance of benefits under the agreement, after it was approved by Jane, results in her having accepted the agreement, before the trial court entered its final judgment. *Brown v. Mesa Distributors, Inc.* 414 S.W. 3d 279, 285 (Tex. App. Houston [1 District] 2013, no pet.); *Jones v. Citibank (South Dakota, N.A.)*, 235 S.W. 3d 333, 338 (Tex. App. Ft. Worth 2007, no pet.).

The second response to this claim is that Eileen is not a party to this appeal. She was not included in the Notice of Appeal filed by Appellant. (CR 258). She is not named as a party in Appellant's brief.

Under these circumstances she has no standing to attack the judgment on appeal. *Breen v. De Lord*, 723 S.W. 2d 166, 171 (Tex. App. Austin, 1986, no writ); *Ditmore Land and Cattle Co. v. Hicks*, 290 S.W. 2d 499, 501 (Tex. 1956).

There is no evidence presented in the trial court that Jane's purported withdrawal of consent to the Rule 11 Agreement was based on Eileen's objections. The letter, on which Appellant relies as the basis for Jane's withdrawal of consent, does not assert Jane withdrew her consent based on Eileen's objection at the hearing at which the agreement was approved. Any such claim on appeal would be a tacit acknowledgment of Eileen's undue influence because it would reflect, after Jane gave her approval she, immediately, withdrew it because of Eileen's objection.

Appellant cites no authority supporting her contention that Eileen's consent under the facts of this case was required for the agreement to be binding on Jane.

**Response to Appellant's Claim that the Rule 11 Agreement Omits Essential Terms**

The following principles of law are applicable to this claim.

1. The question of whether a term in material is a question of law. *Sharif's v. Steen Automotive, LLC*, 370 S.W. 3d 126, 142 (Tex. App. Dallas, 2012, no pet.).

2. Each contract is considered by the Appellate Court on a case by case basis. *id*

3. A contract is legally binding if it terms are sufficiently definite to enable the court to understand the parties' obligations. *Chavez v. McNeely*, 287 S.W. 3d 840,845 (Tex. App. Houston [1st District] 2009, no pet.)

23

4. Where the parties have intended to conclude a bargain, the agreements' silence as to non-essential, or collateral matters is not fatal to the Agreement. *Sharif's v. Steen Automotive, LLC*, 370 S.W. 3d 126, 142 (Tex. App. Dallas, 2012, no pet.)

5. Whether a term forms as essential element of a contract depends primarily upon the intent of the parties as to whether they regarded the term as a vitally important ingredient of their bargain. *Domingo v. Mitchell*, 257 S.W. 3d 34, 40 (Tex. App. Amarillo, 2008, rev. den.).

6. The parties may agree upon some contractual terms, understanding them to be an agreement and leave other terms to be made later. *Oakrock Explorations co. v. Killam*, 87 S.W. 3d 685, 690 (Tex. App. San Antonio, 2002, pet. den.).

7. A contract may contain all essential terms even if the terms contemplate an additional agreement in the future. *McCallon v. Baker's Campground*, 416 S.W. 3d 416, 418 (Tex. 2013).

8. The court may look to the relationship between the parties and the circumstances surrounding the contract to determine if the terms were sufficiently definite for the parties to determine if the terms were sufficiently definite for the parties to understand their obligations. *Ahmed v. Ahmed*, 261 S.W. 3d 190, 195 (Tex. App. Houston [14th District] 2008, no pet.).

The Rule 11 Agreement in this case included the following terms:

1.  Margaret and Nancy agreed to return the funds withdrawn from Jane's account. (2 RR p. 6, l. 21 to p. 7, l. 5; p. 8, l. 3-12).

2.  Jane would continue to live with Eileen and Eileen was to be paid $3,600.00 per month to cover the costs of Jane's care and her basic living costs. (2 RR p. 9, l. 7-13).

3.  The putting of the Rule 11 Letter on record and dismissing the litigation would not impair rights of the parties to seek modification or enforcement of the Rule 11 Agreement to effectuate its purpose. (2 RR p. 11, 1 3-12).

4.  The funds and farm land involved were to be placed in trust to be protected for the benefit of Jane. (2 RR p. 12, l. 5 -14).

5.  The terms of the trust included provisions for the following:

    a.  an institutional trustee;

    b.  that Jane's anticipated living expenses were to come out of the trust to fill the gap between her needs and the income she gets every month;

    c.  any deficiency in meeting her needs and any large transaction or any transaction over and above that amount would require approval of the trustee. (2 RR p. 17, l. 15 to p. 18, l. 5).

The terms of the Rule 11 Agreement in this case meet all the criteria required by the above authorities to constitute a binding agreement.

25

The circumstances leading to the agreement were that the parties were settling disputes in the litigation pending. The disputes included:

(1)    The return on the finds which had been withdrawn from Jane's account by Margaret and Nancy.

(2)    The protection of Jane's savings, cash and land for her benefit.

(3)    The creation of a trust so that the finds and property involved would be held and distributed by any independent entity.

(4)    Eileen's involvement as Jane's caretaker was not disputed except as to her role in Jane attempting to withdraw her consent to the Rule 11 Agreement and her undue influence over Jane related to the attempted withdrawal of consent.

The agreement addressed all matters which were necessary to enable the parties and the court to understand the parties' obligations and intentions.

We respectfully suggest that the above record amply supports the Court's decision to enforce the Rule 11 Agreement as recited. Every essential term under the above authorities has been satisfied by the agreement as it appears in the record.

## CONCLUSION AND PRAYER

Based on the evidence and principles of law stated in this brief, the Appellees request the Court to affirm the judgment of the trial court in all respects, with costs of appeal being adjudged against the Appellant.

26

Respectfully submitted,

THE FOUTS LAW FIRM
1212 13th Street, Ste. 200
P. O. Box 5187
Lubbock, Texas 79408
Telephone: 806/741-0373
Facsimile: 8006/741-1491
E-Mail: ajfpat@nts-online.net

_____
AUBREY J. FOUTS
SBN 07315000

## CERTIFICATE OF COMPLIANCE

Relying on the word counting function of the computer software used to prepare this document, the undersigned certifies that the foregoing instrument contains 6696 words.

_____
OF COUNSEL

# CERTIFICATE OF SERVICE

I do hereby certify that I have electronically filed the foregoing document with

the Clerk of the Court using the Texas E-File system which will send notification of

such filing on this _____ / / _____ day of February, 2015, as follows:

Mr. Michael Sales
ATTORNEY AT LAW
P.O. BOX 2891
LUBBOCK, TEXAS 79408
sales5ralls@aol.com

_Aubrey J Fouts_
OF COUNSEL

# Appendix
# 1

talk.

(Brief recess.)

MR. FOUTS: For the record, I want to present these checks to Ms. Manning, so I get them out of my possession, so I don't lose them.

THE COURT: And these are the originals of the checks that were on D-One. Let the record reflect that Mr. Fouts is sending the original checks, copies of which are in D-One to Ms. Manning.

(Recess.)

THE COURT: All right. We are back on the record in the Durham matter.

Ms. Manning?

MS. MANNING: Jane, when we were here earlier, you had requested that we would be able to go visit and talk about what a trust might mean.

MS. JANE DURHAM: Yes.

MS. MANNING: And you and I have gone and done that; is that correct?

MS. JANE DURHAM: Yes, we have.

MS. MANNING: And actually, even yesterday, somebody came to our office and further explained a trust to you; is that correct?

MS. JANE DURHAM: That is correct.

MS. MANNING: So today is not the first

time that you have thought about a trust, is it?

MS. JANE DURHAM: No.

MS. MANNING: You have been thinking about that; is that correct?

MS. JANE DURHAM: Yes.

MS. MANNING: And you and I have talked, and is it your decision that you want to place the funds that we have been talking about that you have been expending a great deal of effort to get back, you want to place those funds into a trust?

MS. JANE DURHAM: Yes.

MS. MANNING: And that you want to place the farms that you hold into a trust?

MS. JANE DURHAM: Yes.

MS. MANNING: And is that your decision?

MS. JANE DURHAM: Yes.

MS. MANNING: Is that based on what you think is best for you?

MS. JANE DURHAM: Yes.

MS. MANNING: And you understand that some people may or may not like that or be happy with that, but based on what you want, and based on what you think is best for you, is that what you want to do?

MS. JANE DURHAM: Yes, it is.

MS. MANNING: And have you had ample time

to think about it?

MS. JANE DURHAM: Not really, but I guess I am fussy still on thinking about what I am doing.

MS. MANNING: Are you clear minded about this is what you want to do?

MS. JANE DURHAM: Yes.

MS. MANNING: You don't have any doubt about the fact that this is what you want to do?

MS. JANE DURHAM: Right.

MS. MANNING: And that is the place, the farms which are located in Hockley County, and it is about a little over 300 acres?

MS. JANE DURHAM: Yes, I think that is right.

MS. MANNING: Into a trust?

MS. JANE DURHAM: Yes.

MS. MANNING: And at this point, you want to keep them as -- you don't want to liquidate them or sell them. You just want to place that asset into a trust; is that correct?

MS. JANE DURHAM: Yes, that is correct.

MS. MANNING: Along with the cash?

MS. JANE DURHAM: Yes.

MS. MANNING: And then with regard to your monthly income that you get from Social Security

and from your teacher's retirement, you want to be able to maintain the ability to use that on a month-to-month basis, and you are going to be the manager of that?

MS. JANE DURHAM: Yes, I like that.

MS. MANNING: Nothing further, Judge.

MR. FOUTS: We don't have any questions.

THE COURT: All right. The Court adopts the agreement of the parties as the Court's order, and the Court will look forward to receiving an order prepared by the attorneys for the parties, whereupon the Court will sign same.

MS. MANNING: Judge, one thing I just thought of, since we are putting funds in trust, one thing. She doesn't need to send bank statements. The trust will take care of that, since that was on the record.

MR. FOUTS: We would like to have quarterly reports. The trust will give quarterly reports on the status of the trust. And all we want is just a copy of whatever the trust provides.

MS. MANNING: Are you okay with giving them a copy of the quarterly report that will come out from the trustee?

MS. JANE DURHAM: Yes.

MS. MANNING: Is that okay with you?

MS. JANE DURHAM: Yes.

MS. MANNING: Are you okay with -- I don't know that I asked you this question -- all the other terms that we recited into the record about what we are agreeing to about getting your money back, about people coming to visit with you, all of those terms that were discussed? Is that what you want and are you agreeable to that?

MS. JANE DURHAM: Yes, I think I am agreeable.

MS. MANNING: We probably need to put the other two on the record.

MR. FOUTS: Okay. Good with us, Judge.

THE COURT: Did you want an affirmation by Margaret and David?

MS. MANNING: I think since we are going to do that as an agreement, if we could go ahead and have them express their agreement on the record.

THE COURT: Okay. Mr. David Durham, you have heard the terms of the agreement as represented by the attorneys. Are you in agreement with those terms?

MR. DAVID DURHAM: I am.

THE COURT: And Ms. Margaret Durham?

MS. MARGARET DURHAM: Yes.

THE COURT: Okay. Thank y'all very much.

I am sorry. I don't mean to leave you out. I just associate you over there in the corner with Jane. Do you also agree with the terms?

MS. AIKEN: I don't, but I don't know if that makes any difference, but I don't, no.

THE COURT: All right. Thank you very much.

MS. AIKEN: I just think it is grossly unfair to her. That is all.

THE COURT: Thank y'all.

(Proceedings adjourned.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS    )
COUNTY OF LUBBOCK     )

I, Terri Ramsey, Official Court Reporter in and for the 237th District Court of Lubbock County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 125 and was paid by Ms. Molly Manning.

WITNESS MY OFFICIAL HAND this the 15th day of November, 2013.

/s/ Terri Ramsey

_____
Terri Ramsey, Texas CSR 5537
Date of Expiration:  12/31/15
Official Court Reporter
237th District Court
P.O. Box 10536
Lubbock, Texas   79408
(806) 775-1028

# Appendix

# 2

DM

NO. 2013-509,100

| JANE T. DURHAM | § | IN THE 237th DISTRICT COURT |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| | § | |
| V. | § | OF |
| | § | |
| MARGARET L. DURHAM, NANCY C. | § | |
| STEWART, DAVID DURHAM, AND | § | |
| BARBARA FLOURNOY | § | |
| Defendants. | § | LUBBOCK COUNTY, TEXAS |

## DEFENDANTS' SECOND AMENDED COUNTER-CLAIM

### TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Margaret L. Durham, Nancy C. Stewart, David Durham, and Barbara Flournoy, Defendants and Counter-Plaintiffs, and file this their Second Amended Counter-Claim, complaining of Jane T. Durham and Eileen Aiken, Counter-Defendants, and for cause of actions would show the Court the following:

I.
### Discovery

Discovery in this case is intended to be conducted under level 2 of Rule 190 of the Texas Rules of Civil Procedure.

II.
### Jurisdiction and Venue

This Court has jurisdiction and venue of this proceeding.

III.
### Parties

The Counter-Plaintiffs are Margaret L. Durham, Nancy C. Stewart, David Durham, and Barbara Flournoy, who are children of the Counter-Defendant, Jane T. Durham.

The Counter-Defendants are Jane T. Durham, also known as Mabel Jane Durham, and

1



Eileen Aiken, who is a daughter of the Counter-Defendant, Jane T. Durham.

Service of process of this Second Amended Counter-Claim may be obtained on Counter-Defendants by serving their attorney of record, Michael Sales, pursuant to Rule 21a of the Texas Rules of Civil Procedure.

## IV.
### Factual Allegations

1. Jane T. Durham, who is the mother of the Counter-Defendant, Eileen Aiken, and the Counter-Plaintiffs, Margaret L. Durham, Nancy C. Stewart, David Durham, and Barbara Flournoy. The Counter-Defendant, Jane T. Durham, is 93 years of age, and for a number of years, she had relied upon her children, under Powers of Attorney, to handle her financial affairs and to arrange her living circumstances.

2. Prior to late-2012, Ms. Durham, for a period of approximately 12 years, had lived in Lufkin, Texas, originally at an assisted living facility, and in the two years, approximately, prior to her relocation to Lubbock, she had resided in a duplex arranged by her daughter, Barbara Flournoy, who had assisted Ms. Durham with her living and financial affairs during the time she lived in Lufkin.

3. In 2012, a decision was made by her, with the assistance of her children who had been most involved in her care and management of her financial affairs, including Nancy C. Stewart, Margaret L. Durham, and David Durham, for her to relocate to Lubbock, Texas, where her daughter, Margaret L. Durham, resided, as well as, at that time, her daughter, Eileen Aiken.

4. Prior to 2012, Jane T. Durham had been alienated from her daughter, Eileen Aiken, due to a dispute concerning a loan made by Ms. Durham to Eileen Aiken which had not been repaid, and there was no significant communication between them for approximately 12 years, prior to 2012.

2

80

5. Although Mrs. Durham had executed Powers of Attorney to various of her children prior to her relocation to Lubbock, she had never granted a Power of Attorney to Eileen Aiken, and Eileen Aiken had nothing to do with her personal care or her financial affairs for at least 12 years.

6. The children of Mrs. Durham involved, who are the Counter-Plaintiffs in this case, after conferring with Eileen Aiken, who then lived in Lubbock, Texas, and Mrs. Durham, regarding Ms. Durham moving to Lubbock, with Eileen Aiken becoming her caretaker. Eileen Aiken did not have regular employment or the ability to support herself at that time, and the parties believed that Eileen Aiken would be an appropriate caretaker for Mrs. Durham, and the arrangement would also provide support for Ms. Aiken.

7. On November 17, 2012, Mrs. Durham signed a Durable Power of Attorney to her daughters, Margaret L. Durham and Nancy C. Stewart, to handle her financial and personal affairs.

8. The arrangement under which Eileen Aiken was to assume responsibility for the care of Ms. Durham included $3,600.00 per month to be paid to Eileen Aiken from Mrs. Durham's funds for the care of Mrs. Durham, with Margaret L. Durham and Nancy C. Stewart continuing to be involved in Mrs. Durham's financial and personal care.

9. In October 2013, through access to Ms. Durham's financial records through their Powers of Attorney, Margaret L. Durham and Nancy C. Stewart discovered that a check had been written on Ms. Durham's funds for the purchase of an automobile, for approximately $35,000.00, and they had not been contacted or consulted by Eileen Aiken concerning the purchase of such vehicle.

10. Eileen Aiken arranged for the purchase of the automobile by Mrs. Durham. The

3

expenditure for the purchase of the automobile involved a significant part of the liquid funds available for Mrs. Durham's care. As a result of concern about Eileen Aiken's involvement in expending Mrs. Durham's funds, Nancy C. Stewart and Margaret L. Durham withdrew approximately $103,000.00 from Ms. Durham's available cash assets, for the purpose of protecting the balance of the funds Ms. Durham had available from being spent under the influence of Eileen Aiken, in ways which were not prudent.

11. The withdrawal of funds by Margaret L. Durham and Nancy C. Stewart was not done with the intent of depriving Ms. Durham of the benefit of those funds, but was to safeguard the funds pending determination of the circumstances regarding Eileen Aiken's involvement in the expenditure of Mrs. Durham's funds.

12. Both before and after the removal of the funds as set out above, Margaret L. Durham and Nancy C. Stewart repeatedly attempted to contact Mrs. Durham regarding their intent in removing the funds, both in person and by telephone, but they were unable to communicate with either Eileen Aiken or Mrs. Durham. At that time, Eileen Aiken was in complete control of Mrs. Durham.

13. At the time of the removal of the funds as set out above, Ms. Durham had income from her Social Security and Teacher Retirement benefits in the amount of approximately $3,000.00 per month, and she had available funds in an Individual Retirement Account, which were not moved by Counter-Plaintiffs, having a balance of approximately $33,000.00.

14. After the incident involving the removal of the funds as set out above, Eileen Aiken arranged for Ms. Durham to meet with and engage an attorney in Lubbock, Texas, and a suit was filed in this proceeding on October 28, 2013, approximately 10 days after the funds removal incident, and without conferring with either of the Counter-Plaintiffs concerning their

4

82.

intent or planning for the return of the funds.

15. On November 8, 2013, the Counter-Plaintiffs, Nancy C. Stewart and Margaret L. Durham, returned all of the funds which had been removed by them to the attorney engaged by Mrs. Durham, to be held in the attorney's trust account, pending the outcome of the legal proceedings initiated by Mrs. Durham. From the time of the removal of the funds by Counter-Plaintiffs to the date suit was filed, they were unable to communicate with Ms. Durham, as a result of the conduct of Eileen Aiken, and, therefore, had no opportunity to explain to Ms. Durham their intent.

16. At the hearing on November 8, 2013 before this Court, the parties, including all of the Counter-Plaintiffs, their attorney, Ms. Durham and her attorney, in consultation with the Court, reached an agreement intended to resolve the financial, as well as other issues, which resulted in the filing of this suit and a Counter-Claim being filed by Counter-Plaintiffs.

17. The agreement was dictated into the record of the Court, and approved by the Court on the record as an agreement under Rule 11 of the Texas Rules of Civil Procedure.

The agreement included the following terms:

a. All funds which had been removed from Ms. Durham's accounts by the Counter-Plaintiffs were to be placed in the trust account of the then attorney for Ms. Durham, to be distributed pursuant to order of the Court or the agreement of the parties.

b. Mrs. Durham agreed that her funds would be placed in a trust, and there would also be placed in the trust approximately 640 acres of land owned by Mrs. Durham in Hockley County, Texas. The trust would provide funds for the care of Mrs. Durham, and Eileen Aiken was to be continued as the caretaker for Ms. Durham.

c. The agreement included provisions for Margaret Durham, who resided in

5

.83

Lubbock, Texas, to have weekly Sunday visitations with Mrs. Durham, from 6:00 p.m. to 8:00 p.m., and her other children were to be entitled to visitation with her, without interference, at times arranged on 24 hours notice.

d.　　There was to be no interference in the communications and contact with Mrs. Durham's children and her.

19.　　The Court approved the agreement on the record, after acknowledgement of approval by all parties, except Eileen Aiken, who objected to the agreement without specifying any reason for objections.

20.　　Shortly after the agreement was approved, Eileen Aiken prepared a letter, which was purportedly signed by Mrs. Durham, and allegedly dictated by her and notarized, which was delivered to the Court, expressing Ms. Durham's rejection of the agreement and withdrawal of her consent.

21.　　Immediately following the hearing on November 8, 2013, at which time the agreement was reached, the children who are Counter-Plaintiffs in this proceeding attempted to contact and visit with Ms. Durham in accordance with the agreement, but their efforts were rejected by Eileen Aiken, except that Mrs. Durham had lunch with her son, David Durham, following the hearing, and Mrs. Durham appeared to be content with the arrangement and her relationship with David Durham. Margaret Durham was refused access to, or the ability to communicate with, Ms. Durham by Eileen Aiken.

22.　　On November 15, 2013, Eileen Aiken took Ms. Durham to a title company in Levelland, Texas, and Mrs. Durham signed a "Gift Deed" conveying her real property in Hockley County, consisting of three tracts covering 640 acres of land, to Eileen Aiken. This action was contrary to Mrs. Durham's expressed desires up to that time, as well as the provision

6

84

of her Last Will and Testament executed on September 7, 2012, which had disclosed Mrs. Durham's intent to exclude Eileen Aiken as a direct beneficiary of her estate.

23. In addition to her influence over Mrs. Durham in obtaining the deed to Mrs. Durham's land, Eileen Aiken induced Mrs. Durham to surrender her Individual Retirement Account after November 8, 2013, and to take the proceeds in currency, which was then controlled by Eileen Aiken, who could not account for the disposition of those funds.

24. Mrs. Durham has expressed, under oath, that she desires a relationship with her other children, and she wants to have contact with them.

25. Eileen Aiken was in a fiduciary relationship with Mrs. Durham and Counter-Plaintiffs at all times relevant to these proceedings.

26. The words, acts, and conduct of Eileen Aiken reflect that she has willfully interfered with the inheritance rights of the Counter-Plaintiffs by taking and disposing of more than 50 percent of the assets of Mrs. Durham's estate by exercising undue influence, in breach of her fiduciary duties to Mrs. Durham and Counter-Plaintiffs.

### V.
### Cause of Action-Rescission of Deed

Counter-Plaintiffs seek the rescission of the Gift Deed dated November 15, 2013, from Ms. Durham to Eileen Aiken, based on such deed having been obtained by the exercise of undue influence by Eileen Aiken over Ms. Durham, and the breach of her fiduciary duties to Counter-Plaintiffs and Mrs. Durham. Counter-Plaintiffs seek this relief based on the actions of Eileen Aiken being an intentional interference with their inheritance rights.

### VI.
### Cause of Action – Specific Performance of Contract

Counter-Plaintiffs seek an order and mandatory injunction for the specific performance of

7

the contract entered into by the parties on November 8, 2013. The contract is subject to enforcement without regard to the attempt of Ms. Durham to withdraw her consent to the agreement, because the withdrawal is the result of undue influence exercised by Eileen Aiken over Ms. Durham.

## VII.
### Injunctive Relief

In addition to the relief requested above, the Counter-Plaintiffs seek a permanent injunction restraining and enjoining Eileen Aiken from engaging in conduct calculated to breach the agreement of the parties entered into on November 8, 2013, and from engaging in conduct calculated to interfere with the inheritance rights of the Counter-Plaintiffs in this proceeding, involving her alienating Mrs. Durham from contact with the Counter-Plaintiffs, and specifically enjoining Eileen Aiken from interfering with the Counter-Plaintiffs contacting Mrs. Durham or communicating with Mrs. Durham in person.

## VIII.
### Irreparable Harm and No Adequate Remedy at Law

With respect to the injunctive relief requested by the Counter-Plaintiffs, Counter-Plaintiffs will show that they will suffer irreparable harm unless the injunctive relief requested in this case is granted, because, based on the conduct of Eileen Aiken, she will dissipate, or convert, all of the assets of Mrs. Durham to her use, unless restrained, and Counter-Plaintiffs have no adequate remedy at law, because monetary damages could not be determined, with sufficient certainty, or reasonably collectible, in the event of violation of Counter-Plaintiffs' rights by the Counter-Defendant, Eileen Aiken.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs pray that upon final hearing, Counter-Plaintiffs have relief in accordance with the allegations of this Second

8

Amended Counter-Claim. Counter-Plaintiffs further pray for costs of court and general relief.

Respectfully submitted,

The Fouts Law Firm

By: _Aubrey J. Fouts_

Aubrey J. Fouts
Texas Bar No. 07315000
P. O. Box 5187
Lubbock, TX 79408-5187
Tel. (806) 741-0373
Fax. (806) 741-1491
Attorney for Counter-Plaintiffs
E-mail - ajfpatents-online.net

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was delivered to the opposing attorney of record by e-mail and first class mail on this _1st_ day of April, 2014, as follows:

Mr. Michael P. Sales
Attorney at Law
1601 Broadway
Lubbock, TX 79401

_Aubrey J. Fouts_
OF COUNSEL

9

# Appendix

# 3

*Judge Hatch*

**Regarding cause no. 2013-509,100**
**Jane Durham vs. Margaret L. Durham and Nancy C. Stewart**

On Friday, November 8th, 2013, I attended a hearing regarding my case. For approximately two hours, I was forced to wait in the courtroom in my wheelchair while my lawyer and others went to other rooms and discussed the case. Finally, it was time for my case. After some discussion in the courtroom, I was taken to another room. Following the lead of my attorney, whom I trusted at this point, I was asked to sign some papers. When I came back into the courtroom, the judge was asking me about placing my assets into a trust. I told him I needed more time to think about that. At that point, my attorney then took me to another room to try to persuade me to agree to the trust. Upon returning to the courtroom, I was asked by the judge if I was agreeable to the trust and the settlement. I said, "No, not really". At that point, my lawyer tried to convince me that I should agree. By this time, I was so tired and fatigued that I just wanted to go home. So, I finally gave in and said okay. I had trusted my lawyer, but that was my big mistake.

I want to try to repeal, rescind, revoke, annul, et al all of the documentation that was signed at that hearing.

I do **NOT** want to put my assets into a trust. **That is my right.**

I do **NOT** want to be forced to send my bank statements to anyone other than myself. **That is my right.**

I do **NOT** want to be forced or mandated to have contact with anyone, family or otherwise, unless I so desire. **That is my right.**

I do **NOT** want anyone else, family or otherwise, to interfere with my living arrangements. **That is my right.**

**I want to be allowed to control my life myself, including my finances. That is my right.**

I feel that I was betrayed and unduly influenced by my attorney, and that I was asked to make important decisions under duress, and while I was physically and emotionally exhausted. Instead of representing me and my interests, my lawyer suddenly switched sides, and began representing the interests of the opposition.

I feel very sad that the children I trusted took my money without my permission, and are now putting me through this terrible ordeal.

Since the hearing, I have been trying to attain my case file in order to seek other legal counsel and try to remedy the situation. The following notes will document my efforts.

On Monday, November 11, 2013, I requested my case file, case notes, and anything else relevant to my case from my attorney at that time, Molly Manning. Ms. Manning refused to make

my file available for me. Over the next few days, I sent repeated requests for my file, to no avail. On Wednesday morning, November 13, 2013, I notified Ms. Manning that her services would no longer be required, and asked again for my file to be ready for pickup. After further refusals from Ms. Manning, I sent a signed and notarized copy of a letter via e-mail, reiterating the prior termination of her services, and once again requesting that my file be ready for me to pick up by 10:00 am the following morning. Once again, she refused, stating that the file would not be available until 4:45 pm on Thursday evening, November 14, 2013. I was not able to pick the file up at that time. I have since received an e-mail from Ms. Manning stating that now I will not be allowed to pick up my file until sometime next week. All of this unnecessary delay and holding my file from me has made it impossible for me to seek other legal counsel, and possibly caused me to miss important deadlines related to my case.

Jane Durham

Sworn to before me this 15th day of November 2013.

Peggy A Sullivan





PEGGY A SULLIVAN
Notary Public, State of Texas
My Commission Expires
OCTOBER 22, 2017

255

# Appendix

# 4

# Rule 11. Agreements To Be in Writing

Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.

Oct. 29, 1940, eff. Sept. 1, 1941. Amended by order of July 15, 1987, eff. Jan. 1, 1988.